## Case No. 5,562.

GOODYEAR et al. v. CARY et al.

[4 Blatchf. 271; 1 Fish. Pat. Cas. 424.] [1]

Circuit Court, S. D. New York. Feb. 18, 1859.

PATENTS — CONSTRUCTION —"SHIRRED OR CORRU GATED GOODS"— EVIDENCE — ACTS AND ADMIS- SIONS OF THE PARTIES—TRANSFER OF EXCLUSIVE RIGHTS—"RENEWALS."

1. The meaning of the terms "shirred or cor-rugated goods," as used in certain agreements made between Charles Goodyear and Horace H. Day, in 1846, defined.

2. Where certain terms are used in a grant, which have a well-known general meaning, such meaning must, in the interpretation of such grant, be given to the terms used, unless it appears that some other or different meaning was intended by them.

3. If such general meaning appears clearly from the grant itself, extraneous evidence will not be resorted to.

4. It is not to be presumed that a grantor intends to grant more than he has a right to grant, or that a grantee intends to receive, by way of grant, that to which he has a full right without a grant.

5. In giving an interpretation to a particular clause of a deed, every part of the deed must be looked to.
[Cited in Straat v. Uhrig, 56 Mo. 482; Mayor of New York v. Starin, 106 N. Y. 19, 12 N. E. 631.]

6. Acts and admissions of the parties to a deed, subsequently to its execution, are legiti-mate evidence to show what they then admit-ted to be the meaning of certain terms used in the deed, in order to ascertain the meaning of those terms, when those terms are am-biguous.

7. A patentee, by an agreement executed by him, July 18th, 1844, transferred the exclusive right, under his patent, for the unexpired terms of all "patents or renewals of patents owned by him, or in which he may have an interest, is-sued or to be issued:" Held, that the term "renewal" carried the right to extensions of such patents, including extensions of patents issued to him.

8. The case of Wilson v. Rousseau, 4 How. [45 U. S.] 646, commented on and explained.

[1] [Reported by Hon. Samuel Blatchford, Dis-trict Judge, and by Samuel S. Fisher, Esq., and here compiled and reprinted by permission. The syllabus and opinion are from 4 Blatchf. 271, and the statement is from 1 Fish. Pat. Cas. 424.]

In equity. This was a motion for a provisional injunction to restrain the defendants [William H. Cary and others] from infringing upon letters patent [No. 3,633] for "improvements in the manufacture of India-rubber" granted to Charles Goodyear June 15, 1844, reissued December 25, 1849 [No. 156], and extended for seven years from June 15, 1858, in so far as said letters patent covered the manufacture of shirred, corrugated or elastic rubber goods, the exclusive right of making and vending which, it was insisted by complainants Day and Hay, had been granted to them, by Charles Goodyear, by a number of conveyances and agreements which had been made between themselves and Goodyear. In the first of these, dated October 29, 1846, Goodyear, after reciting his patents of June 15, 1844, March 9, 1844, and February 24, 1839, covenants, among other things, as follows: "First, That he, the said Charles Goodyear, hath granted, bargained, sold, assigned, transferred, and set over, and doth hereby grant, bargain, sell, assign, transfer, and set over to the said Horace H. Day, his executors, administrators, and assigns: (1) The full, absolute, and exclusive right, license and privilege, to make, use and vend shirred or corrugated goods, to use in the manufacture thereof all or any of the machinery or improvements mentioned and described in and secured by all or any of said letters patent, and also to use, in the manufacture of such shirred or corrugated goods, all or any of the compounds, fabrics or ingredients, and methods of preparing such compounds, fabrics, or ingredients, mentioned or described in and claimed by said letters patent, for and during the unexpired term of said letters patent above enumerated, and of all renewals or extensions of the same."

A subsequent agreement, dated December 5, 1846, was, in full, as follows:

"Whereas, I, Charles Goodyear, of New Haven, in the state of Connecticut, am the holder and owner of four several letters patent granted by the United States of America, to wit: One bearing date of February 24, 1839, two bearing date of March 9, 1844, and one bearing date of June 15, 1844, and possess the sole and exclusive right to the same as far as relates to the use of all or any of the patented articles in the preparing and manufacturing shirred or corrugated goods, except three several licenses for the same, which are simultaneously herewith to be assigned to Horace H. Day, hereinafter named, to be cancelled; and whereas, I have agreed to assign to said Horace H. Day, of Jersey City, the sole and exclusive right to make, vend, and sell to others to be used, shirred or corrugated goods: Now this indenture witnesseth, that for and in consideration of the sum of five thousand dollars, to me in hand paid by the said Horace H. Day, the receipt whereof is hereby acknowledged, and the said Day forever released from the same; and in consideration of the conditions hereinafter contained, by said Day to be performed, I have assigned, sold, and set over, and do hereby assign, sell and set over, to the said Horace H. Day, his executors, administrators, and assigns, the sole and exclusive right, license, and privilege, for the whole of the United States, to use the machinery in said above recited patents described, and to make and vend the shirred or corrugated goods in said patents mentioned, and to use in the preparation thereof, and also in the preparation and manufacture of India-rubber hose, patent boats, Griffith's patent cotton-floaters, and Day's patent chairs and settees, the compounds and fabrics in said letters patent described, for and during the term of said letters patent, and of all renewals and extensions thereof. And the said Charles Goodyear does in like manner, and for the consideration aforesaid, give and grant to the said Horace H. Day, the full and exclusive right, license, and privilege, to use in the manufacture of such shirred or corrugated goods, all improvements in the composition or fabrics or machinery aforesaid, or new compositions, fabrics, or machinery made or to be made by said Goodyear, or for which said Goodyear now holds patents, or may obtain or hold patents, by grant, purchase or otherwise, for and during and until the expiration of the patents, an exclusive right whereunder is above assigned, and of all renewals and extensions thereof. And the said Horace H. Day, in consideration of the premises, promises and agrees to and with said Charles Goodyear, to pay him a tariff or duty of three cents per square yard on all shirred or corrugated goods that may be made by him, and also to stamp every article made by him under this license with the name of said Goodyear, and the dates of his patents, according to law. In witness whereof, the said parties to these presents have hereunto set their hands and seals, this fifth day of December, one thousand eight hundred and forty-six. Charles Goodyear. (L. S.) Horace H. Day. (L. S.)

"Sealed and delivered in the presence of James Bishop. Edgar S. Van Winkle."

And on May 24, 1858, after the reissue, Goodyear executed the following conveyance:

"In consideration of the sum of one dollar and other valuable considerations received and to be received by me from Horace H. Day, as hereinafter provided, I hereby sell, license, and convey, and do hereby agree to confirm the same within three months from the 15th day of June next, by such further full and proper deed of conveyance as he may deem necessary, the full, absolute, and exclusive license, right, and privilege to make, use, and vend my invention of vulcanized rubber, as described and patented in the reissued patent granted to me on December 25. A. D. 1849, for the present and all extended or renewed terms of said patent, as the same may or can be used in the manu-

facture of all braided, woven, cemented, or sewed fabrics, or such as are or can be covered or protected on one or both sides with substances other than rubber, and in all smooth, elastic, shirred goods; and also to make and sell India-rubber threads of vulcanized rubber, and all threads or sheets of rubber which are or can be made or finished by union with or to be covered by fibrous substances. And I hereby authorize and empower the said Day to use my name to prosecute and defend the rights and privileges hereby granted, provided the same be done without expense to me; and the instrument confirming this conveyance shall contain a proper and sufficient power of attorney for such purpose. And the terms and conditions upon which this license shall be held and enjoyed, as to bonuses, not exceeding in the whole the sum of thirty thousand dollars, and the tariffs not exceeding five cents a pound on the product, shall be fixed and determined by Nathaniel Hayward and Thomas A. Jenckes, whose award in the premises shall be final, and shall be made within three months from the 15th day of June next. And to the faithful performance of all the covenants and agreements aforesaid, I hereby bind myself and my legal representatives. In testimony whereof, I have hereunto set my hand and seal this the twenty-fourth day of May, A. D. 1858. Charles Goodyear. (L. S.)

"Signed, sealed and delivered in presence of Gilbert Sweet. Fred'k C. Wagner."

Letters patent [No. 3,461] had been granted to Charles Goodyear March 9, 1844, for a new and useful manufacture of India-rubber goods, called by him "corrugated or shirred India-rubber goods." The patent of June 15, 1844, was for a particular preparation of India-rubber known as "vulcanized rubber," which might be applied to India-rubber goods of every description. If the right to use this preparation of rubber, in the grant from Goodyear to complainants, was limited to goods manufactured under the patent of March 9, 1844, there was no infringement. But if the terms "shirred or corrugated goods," in these grants included, as well, elastic or woven goods of every description, then the defendants were violating the rights of complainants.

Benjamin R. Curtis, Thomas A. Jenckes, and Clarence A. Seward, for plaintiffs.

James T. Brady, Edward N. Dickerson, and George Gifford, for defendants.

INGERSOLL, District Judge. The first of the original deeds containing the grants of right, was executed by Goodyear and Day, on the 29th of October, 1846; another, called "Articles Additional or Supplemental" to those contained in the first-mentioned deed, was executed on the 5th of November of the same year; another, a "Memorandum of Agreement," auxiliary to the last-mentioned deeds, was executed on the same 5th of November; another was executed on the 5th of December of the same year; and another on the 24th of May, 1858.

The first question to which attention must be directed is—what did the parties to these several deeds mean and understand by the terms used in the grants of right in the deeds referred to, namely: "shirred or corrugated goods?" The rights of the plaintiffs under these deeds, or either of them, depend upon the determination of this question. The goods which the defendants sell are elastic woven rubber goods, thread of vulcanized India-rubber, prepared according to Goodyear's patent of the 15th of June, 1844, which has been extended for seven years from June 15th, 1858, forming a part of the warps. Selling or making such elastic woven goods without a license is an infringement of the last-mentioned patent; and, if such elastic woven goods were intended by the parties to the deeds made in 1846, to be included in the terms "shirred or corrugated goods," as used in the grants of right, in either of those deeds, then it follows that what the defendant is doing is in violation of the rights of the plaintiffs Day and Hay.

Where certain terms are used in a grant, which have a well-known general meaning, then, in the interpretation of such grant, such well-known general meaning must be given to the terms used, unless it appears that some other or different meaning was intended by them. The parties differ as to what was the well-known general meaning of the terms "shirred or corrugated goods," as used in the grant, and numerous affidavits have been introduced to prove what their well-known general meaning was when the deeds of 1846 were executed. It will not be necessary, however, to pay any particular attention to these affidavits, if it appears clearly from the deeds themselves, what the meaning was which the parties to the deeds intended should be applied to these terms. The defendants insist that this does appear clearly from the deeds, and that the meaning of the terms "shirred or corrugated goods," used in the grant, was only the goods described in, and patented by, what is called the "shirred goods patent" of Goodyear, issued March 9th, 1844.

To a just determination of the question now under consideration, it is necessary to notice particularly the several patents of Goodyear which are referred to in the deed executed by him and Day, October 29th, 1846. On the 30th of October, 1840, a patent had been obtained by Dupont and Hyatt, for a new and useful improvement in the manufacture of gaiter-boots, by the introduction of gum-elastic gores. On the 7th of November, 1848, a patent was obtained by Richard Solis, for a new and useful improvement of elastic cloth. It was called "elastic

cloth," not "shirred or corrugated" cloth. On the 24th of February, 1839, a patent was obtained by Goodyear for improvements in the mode of preparing caoutchouc, or India-rubber, for the manufacture of various articles. On the 9th of March, 1844, a patent was obtained by him for a new and useful manufacture of goods, which he, in his patent, denominated "shirred or corrugated India-rubber goods." The goods so manufactured and denominated were elastic. The elastic goods which Goodyear manufactured according to his patent, and to which he thus gave the name of "corrugated or shirred India-rubber goods," by which name they have ever since been generally known, were formed "by the stretching of strips or threads of India-rubber, to such extent as may be desired, and covering the strips or threads on opposite sides with laminae of cloth, leather, or any other suitable material, which laminae are united to each other, and to the strips or threads, by means of India-rubber cement, the same being effected so as to produce manufactured articles substantially as in the specification is set forth, which will, by the contraction of the strips or threads of India-rubber, become corrugated, so as to form distinct plaits between them, and present a corded appearance, and will also possess a degree of elasticity limited by the non-elastic material which constitutes one or both of the laminae." The elastic goods manufactured according to the Solis patent, were in that patent called and known as "elastic cloth," and not "shirred or corrugated India-rubber goods." And the only elastic goods which Goodyear ever had the exclusive right to manufacture, were the particular kind of elastic goods made according to this patent of March 9th, 1844, and so called by him "corrugated or shirred India-rubber goods." No one had, however, a right to use, without his consent, in the manufacture of other kinds of elastic India-rubber goods, the particular kind or preparation of India-rubber which had been or should be patented to him. So far as Goodyear was concerned, every one had a right to manufacture all kinds of India-rubber elastic goods, except such as were described in his patent of March 9th, 1844, provided they did not use any particular preparation of India-rubber patented to him. On the same 9th of March, 1844, a patent was granted to Goodyear for a new and useful manner of constructing a machine for manufacturing the "corrugated or shirred India-rubber goods" mentioned and described in the before-mentioned patent. In this specification he states, that he had, in the before-mentioned specification, described the nature of what he denominated "corrugated or shirred India-rubber goods." That name he had given to the particular kind of elastic goods manufactured according to that patent. And, on the 15th of June, 1844, a patent was granted to him for

new and useful improvements in the manner of preparing fabrics of caoutchouc or India-rubber.

On the 12th of August, 1855, Goodyear gave to Hutchinson & Runyon, and also to Ford & Co., "a free license to manufacture, use and vend shirred or corrugated goods of every description;" and, in the month of September, in the same year, he gave to Onderdonk & Letson "a concurrent right, together with, and in connection with or separate from, Hutchinson & Runyon and Ford & Co., and the said Charles Goodyear and his associates, a free license to manufacture, use and vend shirred or corrugated goods of every description, in so far as the said Charles Goodyear may have any rights or privileges."

"The agreement of the 29th of October, 1846, between Goodyear and Day, was executed by both parties, under their hands and seals. After reciting that Goodyear owned and controlled all the rights and privileges granted to him by the four before-mentioned patents in his favor, so far as such rights and privileges relate to the manufacturing of shirred or corrugated India-rubber goods, and the use of the machines or improvements for the manufacturing of such goods and the making and use of his patented gum, or compound, in the manufacture of such goods, excepting the licenses of Hutchinson & Runyon, Ford & Co., and Onderdonk & Letson, above-mentioned, Goodyear grants, sells and assigns to Day, "the full, absolute, and exclusive right, license and privilege, to make, use and vend, shirred or corrugated goods; to use, in the manufacture thereof, all or any of the machinery or improvements mentioned and described in, and secured by, all or any of said letters patent; and also to use, in the manufacture of such shirred or corrugated goods, all or any of the compounds, fabrics or ingredients, and methods of preparing such compounds, fabrics or ingredients, mentioned or described in, and claimed by, said letters patent, for and during the said unexpired term of said letters patent above enumerated, and of all renewals and extensions of the same." He also grants to Day "the like full, absolute and exclusive right, license and privilege, for the like terms and periods, to use all or any of the machinery, compositions or fabrics patented by said Goodyear, or which he shall obtain patents for, in the manufacture of India-rubber hose, of the kind patented by said Day, air-beds and air-pillows of all kinds, Day's patent boat, Griffith's patent cotton-floater, and Day's patent chairs and settees."

The extent of the first-mentioned grant depends upon the meaning of the terms "shirred or corrugated goods," as used in the granting clause of the deed, and as understood by the parties to it, when the grant was made by Goodyear and accepted by Day. That meaning must be gathered from the grant itself in the deed contained, if from it

the true and clear meaning can be ascertained. That meaning depends upon the construction of the deed itself, for deeds must speak for themselves when they are able to speak clearly and understandingly.

The recital in the deed was made for the purpose of showing what was to be the subject of the grant. Goodyear states that he owns the rights secured in the four patents enumerated, so far as such rights relate to the manufacture of "shirred or corrugated India-rubber goods," which were the subject of the grant, except the three licenses named, which were for "shirred or corrugated goods." At that time, the whole right to use vulcanized rubber, in the manufacture of all elastic woven goods and elastic cloth, except "shirred or corrugated goods," made according to the patent of March 9th, 1844, was in the Naugatuck India-rubber Company. The first suggestion that occurs, upon reading the recital, is this: If Goodyear had intended that the grant should comprehend the exclusive right to use his vulcanized rubber, and his other preparations, in the manufacture of elastic woven goods and all wrinkled or corrugated cloth, whether made according to the shirred goods patent or not, under the name of "shirred or corrugated goods," he would have expressly included this right in the exceptions which he made. For it was well known to him that the right, as to woven goods, was in that company.

It should be borne in mind, that Goodyear had no exclusive right to manufacture any kind of elastic India-rubber cloth except such as was manufactured according to the patent of March 9th, 1844, and called "shirred or corrugated India-rubber goods," though he had an exclusive right to a certain kind of prepared or cured India-rubber, which could not be used by any one in the manufacture of any kind of elastic cloths, without his permission. So far as Goodyear was concerned, all kinds of India-rubber elastic goods, or elastic cloths, by whatever name known, except the particular kind of India-rubber cloth made according to his patent of March 9th, 1844, and to which he had an exclusive right, could be made by any one, unless the one making it should use, in the manufacture of it, the particular kind or preparation of India-rubber material patented to him. It is not to be presumed that a grantor intends to grant more than he has a right to grant, or that a grantee intends to receive, by way of grant, that to which he has a full right without a grant.

The grant of right contained in the granting clause of the deed of the 29th of October, 1846, was of an exclusive right, which, at the time, was vested in Goodyear, and not of anything to which Day had a right without such grant. It was of the exclusive right which Goodyear then had to make "shirred or corrugated goods," with the license and privilege to do certain things, which would make that exclusive right more valuable; which certain things were, the use, in the manufacture of the "shirred or corrugated goods," the exclusive right to which had been conveyed, of any of the machinery or improvements mentioned and described in and secured by any of the letters patent; and the use also, in the manufacture of such "shirred or corrugated goods," an exclusive right to which had been conveyed, of any of the compounds, fabrics or ingredients mentioned or described in said letters patent. The terms of the grant, therefore, taken in connection with the recitals in the preamble, without a resort to the subsequent portions of the deed, to aid in their interpretation, import that what was granted was the exclusive right which Goodyear had, by virtue of his patent of March 9th, 1844, to make "shirred or corrugated goods," with the license and privilege to use, in the exercise and enjoyment of such exclusive right granted, certain other rights secured to him, to make that exclusive right more valuable. This was the extent of the grant, as it appears from the language of the granting clause. This was what the parties meant by the terms which they used. So far as it respects "shirred or corrugated goods," that was the extent of the grant. The other patents of Goodyear were to be used only in the manufacture of the "shirred or corrugated goods" secured by the patent of March 9th, 1844. There was no right given to use Goodyear's preparations and improvements in India-rubber, no right to use the vulcanized rubber, in the manufacture of any elastic articles, or elastic goods, or elastic cloths, except the "shirred or corrugated" goods made according to the shirred goods patent.

But, in giving an interpretation to a particular clause of a deed, we must look to every part of it, in order to ascertain whether such interpretation is the true one, to see if, in this deed, any more extended and enlarged meaning can be given to the terms "shirred or corrugated goods," as used in the granting clause, than we have already given to those terms, by the consideration of such granting clause, taken in connection only with the recitals in the preamble contained.

The deed contains several covenants on the part of Goodyear. One is, "that said Goodyear will not hereafter grant any right, license, or agreement to any person or persons, bodies politic or corporate, to manufacture, vend, or use corrugated or shirred goods, or to build, use or vend any of the aforesaid machinery, or to use any of his compounds, in the manufacture of shirred or corrugated goods, and will not himself manufacture or import any corrugated or shirred goods; and, in case of a violation of this section," (of the deed,) "then the covenants of said Day, hereinafter contained, shall not be binding on said Day." The covenants of Day here referred to were, that he would pay tariff and do other acts. It is claimed that this covenant is inconsistent with the construction already put on the

granting clause, and consistent only with the construction given to it by the plaintiffs. This covenant was entered into for the purpose of relieving Day from the obligation of his covenants, in case Goodyear should do certain things, the doing of which would be in violation of the right granted. It was designed more effectually to secure Day in the exclusive right granted. The terms "shirred or corrugated goods" are used three several times in this covenant. It is insisted that, as used in the last two instances, their meaning is different from that intended for them as used in the first part of the covenant; that, in the last two instances, they mean "shirred or corrugated goods" made in a different manner from those manufactured according to the patent of March 9th, 1844; that they mean all India-rubber goods, when made by combining threads or strands of vulcanized rubber with some textile material; and that such latter goods are comprehended in the terms "shirred or corrugated goods." It is admitted that the meaning of the terms, as used in the first part of the covenant, is "shirred or corrugated goods" made according to the patent of March 9th, 1844. The argument is, that the first part of the covenant is, that Goodyear would not license any one to make corrugated goods according to his patent; that that was sufficient to protect Day in the use of the vulcanized rubber, in manufacturing according to that patent; and that the latter portion of the covenant was intended to prevent Goodyear from licensing any one to use his vulcanized rubber and compounds, in the manufacture of other kinds of India-rubber goods, made by combining threads or strands of India-rubber with some textile material.

After the most attentive consideration, I cannot discover anything in this covenant inconsistent with the construction which I have put upon the granting clause. All its provisions are consistent with such construction. There are, in the covenant, four several stipulations on the part of Goodyear: First—That he will not grant any right or license, to any one, to manufacture, vend or use "shirred or corrugated goods." This confessedly refers to the exclusive right, which, at the time the deed was executed, Goodyear had to the "shirred or corrugated goods" made according to his patent of March 9th, 1844. Second—That he will not grant any right or license, to any one, to build or use any of the machinery mentioned in the granting clause. There was no machinery mentioned or alluded to, except the machinery used to make "shirred or corrugated goods" according to the shirred goods patent. This stipulation, also, confessedly refers to the goods made according to that patent. Third—That he will not grant to any one the right to use any of his compounds in the manufacture of "shirred or corrugated goods." The assignment of the right to make "shirred or corrugated goods" according to the patent of March 9th, 1844, did not carry with it any new right secured by the patent of June 15th, 1844. The rights secured by the latter patent were distinct from, and independent of, any rights secured by the former. The first stipulation had reference to the former patent, and the former patent only. In that stipulation, the use of the latter patent was not included. The object of the parties was, as is confessed, to secure to Day, the grantee of the former patent, in the manufacture of the goods secured by that patent, the further exclusive right to use the latter patent. And the intent of the parties, in making this latter stipulation, was to secure that object. There is nothing in this stipulation to show that it had reference to any other object. Fourth—That he (Goodyear) will not manufacture or import any corrugated or shirred goods. There is nothing in this stipulation to show that these terms were used in any different sense from that given to them in the other stipulation. To apply them, in this stipulation, as meaning elastic woven goods, would lead to this result: If Goodyear should manufacture or import woven goods, composed of threads or strands of common gum, which everybody has a right to manufacture and import, and which never were a subject of controversy before the settlement which resulted in the grant in question, then all the covenants which Day had entered into would be discharged.

Another covenant on the part of Goodyear is, "that Horace H. Day, his representatives and assigns, shall have and enjoy the like full, free, and exclusive right, license and privilege to make and use, in the manufacture of shirred or corrugated goods, any improvements made, or to be made, by said Goodyear, or of which he, his representatives or assigns, may become the holders or owners, for which patents have been or shall be obtained, which relate to shirred or corrugated goods, or the machinery for preparing or making the same, or the composition, stuff or fabric of which they may be composed, or the machinery for preparing or finishing such composition, stuff or fabric, and also the right to use such composition, stuff or fabric, in the manufacture of all the other articles in the grants above enumerated." It is claimed that the provisions in this covenant are also inconsistent with the views already taken of the rights granted to Day. The subject-matter of the grant in the first clause was an existing thing, to which Goodyear had an exclusive right, and certain rights to other existing things, the use of which would make the enjoyment of the grant more valuable. The provision as to the future inventions, improvements or patents of Goodyear, secured to Day the use of them only as to the shirred or corrugated India-rubber goods, and the hose, air-beds, air-pillows, Day's patent boat, and Griffith's patent cotton-floater. After a full and careful consideration of this covenant, I can discover nothing in it inconsistent with the construction put upon the granting clause.

By the "shirred or corrugated goods" mentioned in this covenant, are meant the "shirred or corrugated goods" to which Goodye.r had an exclusive right, such as were made according to the patent of March 9th, 1844; and the "composition, stuff or fabric" mentioned, refers to the material of which "corrugated goods" made according to that patent might be composed.

The first covenant on the part of Day is, that he will pay to Goodyear a tariff of three cents per square yard, for all shirred or corrugated goods to be made or used by him during the term of said patents, (the four mentioned in the recital to the deeds,) or any of them, or of any renewal or extension thereof, or of any new patent taken out on the surrender of an old one. Then follows this stipulation: "It being understood and agreed by the parties, that all shirred or corrugated goods of any kind, made or used by said Day or his assigns, shall be considered as made and used under this agreement, and subject to said tariff or assessment, excepting from the operation of this clause, however, all shirred or corrugated goods made with strands or threads of native or common gum, when such goods may be manufactured by said Day for the purpose of competing with such goods; and, when so made by him for such purpose, he shall not be liable to pay any duty or assessment thereon." In order to put a proper construction upon the stipulations contained in this covenant, and to understand their true meaning, they should be considered in connection with a covenant on the part of Goodyear, in which he agrees that he "will, at his own expense and cost, prosecute all and every person, or persons, or bodies corporate, who shall infringe, to the injury of said Day, in the use of the privilege hereby granted and conveyed, all or any of the patents above enumerated or referred to, by the manufacture or sale of shirred or corrugated goods; and that he will, with all due diligence, carry on such prosecutions to final judgment, against each and every violator of the same, or until it shall be judicially and beyond appeal decided that said patents so violated as aforesaid are not valid in law." It is claimed by the plaintiffs, that this covenant on the part of Day, when taken in connection with this latter covenant on the part of Goodyear, clearly shows that the parties were dealing with woven goods, or some species of goods not made under Goodyear's shirred goods patent, particularly when those two covenants are considered in connection with another covenant, wherein it is mutually agreed, that, in the event of any other person manufacturing, or importing, or selling shirred or corrugated goods, except such shirred goods as are made with strands or threads of native or common gum, such as is generally used by woven suspender makers, and thereby materially impairing the profits which would accrue to Day when in the exclusive

enjoyment of the privileges granted, then the tariffs agreed to be paid are to cease.

There was granted the right to at least two kinds of "shirred or corrugated goods:" First—the right to make such goods according to the Goodyear patent, when the strands or threads of rubber were of native or common gum; and, second, the right to make such goods according to such patent, with the additional right to use, in the making of them, strands or threads of vulcanized rubber, prepared according to the patent of June 15th, 1844. There was also an additional right to use the patented machine to make such goods. These the defendants claim were all the rights conveyed by the first granting clause. At the time of the grant, India-rubber woven elastic goods, with strands or threads of common rubber, and which the plaintiffs claim were included under the name of "shirred or corrugated goods," could be made without infringing on the patent of March 9th, 1844. The exclusive right to make said woven goods was not in Goodyear to grant. The right was in the public. From the covenants last above recited, it appears, First, that Day was to pay tariffs on all "shirred or corrugated goods" included in the grant, or attempted to be included; second, that Goodyear was to protect Day in the enjoyment of all rights which had been secured to him by patent, and granted to Day, and, if he did not, his right to tariff on all goods made should cease; third, that, at some time during the continuance of the grant, it might so happen, that Goodyear would not have it in his power to protect Day in the exclusive right to manufacture a kind of "shirred or corrugated goods" which were composed of threads or strands of common rubber, and upon which Day had agreed to pay tariff; fourth, that, in the latter event, Day was to protect himself, and that, when he did so protect himself, by the manufacture of such goods to compete with the like kind of goods in the market, he should not pay tariff on such goods so made for such purpose, although he should continue to pay tariff on the other kinds of goods made in pursuance of the grant.

Taking the stipulations in these several agreements in connection with each other, it is argued by the plaintiffs, that the parties were treating about other goods, under the name of "shirred or corrugated goods" than such as were made according to the Goodyear patent; that Goodyear could protect Day by suits and by injunctions, so that he could have the monopoly in the market of such goods as were made according to the patent; that, as, during the period of the grant, it might so happen that there would be a kind of "shirred or corrugated goods" made of threads or strands of common rubber, upon which Day was to pay tariff, brought into the market, which would not be in violation of the patent of Goodyear of

March 9th, 1844, against which Day could not be protected by Goodyear, but could only be protected, if protected at all, by competition, such kind of goods were, therefore, different from goods made according to Goodyear's patent; that they were woven goods, or elastic rubber goods, composed of strands or threads of rubber, however made; and that, by the understanding of the parties, as shown in the deed, the deed was intended to secure to Day the privilege to make this latter kind of goods, under the name of "shirred or corrugated goods," with the exclusive right to use, in the making of the same, the vulcanized rubber patent, as well as the right to manufacture according to the shirred goods patent. The argument is plausible, and, if sound, would tend strongly to show, that the view I have taken of the rights conveyed by the granting clause, is too limited.

The deed now under consideration was executed after a long conflict between the parties, as to the rights which were secured to Goodyear by his patents. The stipulations contained in it were entered into (Day recognizing the rights of Goodyear in the matters in controversy) with a view to a settlement of the controversy, and to transfer to Day certain rights which Goodyear had by virtue of his patents. The right to make elastic India-rubber cloth, composed of threads or strands of common rubber, by whatever name called, when the same was not made according to Goodyear's patent of March 9th, 1844, had not been in controversy. There was nothing to settle about that right. Day had as much right in this respect as Goodyear had. The argument assumes, that for the making of this kind of goods, to manufacture which Day had as much right as Goodyear, Day agreed to pay a tariff; and that the goods thus manufactured should, therefore, be considered as being manufactured under the deed, by the name of "shirred or corrugated goods," and as such liable to pay a tariff, except when they might be manufactured by Day for competing with such goods thrown into the market by others.

The grants under the deeds were for the longest period during which any of the four patents was to continue, and for the additional time that any of them might be extended. Day was to have the benefit of all or any of them, and was to pay the tariff as agreed, so long as he had the benefit of any one of the patents, though the others had expired by lapse of time and had not been extended. The tariff was to be paid in consideration of benefits received and enjoyed. The argument of the plaintiffs leads to this result: If the shirred goods patent had been extended, and the vulcanizing patent had not been, then, if Day did what anybody else had a right to do without any permission of Goodyear, namely, make elastic woven goods, or any kind of elastic India-rubber goods, or elastic rubber cloth, (provided it

was not made according to the shirred goods patent,) with threads or strands either of common rubber or vulcanized rubber, he would be obliged to pay the tariff. Protection to Day in the rights for which he was to pay tariff, was one great object of the deed. He could not, in the case supposed, be protected by Goodyear, for the making of such goods would not be in violation of any patent; and he could not protect himself by competition, so as to avoid the payment of the tariff, as it respects the goods made with strands or threads of vulcanized rubber, for the stipulation in regard to protection by competition is limited to such goods as are made "with strands or threads of native or common gum." He would, therefore, be obliged to pay tariff, although he was not protected by Goodyear, and was without the power of saving himself from the payment of such tariff, by manufacturing for the purpose of competing with such goods.

A more satisfactory construction can be put upon the stipulations in the covenants just referred to—one that will make such covenants entirely consistent with the views already taken of the rights conveyed by the granting clause, and inconsistent with the views taken of such clause by the plaintiffs. The parties were providing, in the stipulations, not only for a state of things which might exist during the then existing patents, but also for a state of things which might exist when one of them should be extended and the others have expired—when the vulcanizing patent might be extended and the shirred goods patent have expired, and also when the shirred goods patent might be extended and the vulcanizing patent have expired. They contemplated a state of things which at present exists, when the vulcanizing patent has been extended, and when all the other patents have expired. This being the state of things, the shirred goods patent having expired, every one now has a right to make "shirred or corrugated goods," composed of "threads or strands of native or common gum." But no one, except Day, has a right to make such goods of "threads or strands" of vulcanized rubber prepared according to Goodyear's patent of June 15th, 1844. Now there is a state of things which the parties foresaw when they executed the deed and incorporated in it the above covenants, and which they, by said covenants, provide for. Day now has an exclusive right to make "shirred or corrugated goods" according to the directions given in the patent of March 9th, 1844, when the rubber strands or threads are composed of the vulcanized rubber; and Goodyear, having a patent for the vulcanized rubber, must protect him in that right. If he does not, the obligation on the part of Day to pay tariff ceases. Day holds now no exclusive right to make shirred goods according to Goodyear's patent, with "threads or strands of native or common gum," but has a right to make such goods in

common with any one else; and he is obliged to pay tariffs for making such goods "with native or common gum," during the existence of the extended vulcanizing patent, for he so contracted by the deed, unless, in the language of the deed, "such goods may be manufactured by said Day for the purpose of competing with such goods, and, when so made by him for such purpose, he shall not be liable to pay any duty or assessment thereon." The vulcanizing patent is now in existence, and Day can now be protected by Goodyear, when that patent is violated by the use of vulcanized rubber in the manufacture of "shirred or corrugated goods." The shirred goods patent has expired. When such goods are now to be made with "threads or strands of native or common gum," Day cannot be protected by Goodyear against the manufacture of such goods. But, if he makes such goods for "the purpose of competing with the same goods," in the market, he is, according to the stipulations in the deed above referred to, not liable to the payment of tariffs thereon.

On the 5th of November, 1846, there were "articles of agreement" entered into between the parties, under their hands and seals, additional or supplemental to the articles in the first deed, which articles in the first deed were to be construed and governed by the articles in the deed of the said 5th of November, wherein they differed or were inconsistent; but in all other respects, the first deed was to remain in full force. By the deed of the 5th of November, it was stipulated that Goodyear should procure and cause to be assigned to Day, to be canceled, the three several licenses to.Hutchinson and Runyon, to Ford & Co., and to Onderdonk & Letson, which, by the first deed, he was excused from doing; and there is a stipulation that the reassignment of said three licenses to Day shall be a condition precedent to the performance of any part of the covenants by him. In these last-mentioned articles there is also a covenant by Day, that, while Goodyear protects him, Day, "in the exclusive right to manufacture and vend shirred or corrugated goods," he, Day, will refrain from doing certain things therein mentioned, thereby showing that what the parties meant by the terms "shirred or corrugated goods" was, the exclusive right which Goodyear had to manufacture and vend such goods, under his· patent referred to in the recitals of the deed first executed; for, Goodyear could not protect Day in such exclusive right, unless he had in him such exclusive right.

The second deed, executed by the parties on the 5th of November, 1846, was entitled "memorandum of agreement," and was to be auxiliary to the two other deeds above-mentioned. It contained a stipulation for "a release from the Naugatuck Company, of the right or license to make any articles which, by said before-mentioned agreements, Day is licensed to make." After Goodyear had obtained his vulcanizing patent of the 15th of June, 1844, by a deed executed between him and the Naugatuck India-Rubber Company, dated July 18th, 1844, for certain considerations in the deed named, he granted unto said company the full and absolute license to use any and all of his preparations of India-rubber and improvements in the preparations of India-rubber, for manufacturing cloth or any other article of merchandise, or any articles to which the same may be applicable, for and during the unexpired term or terms of any patent or patents, or renewals of patents, owned by him, or in which he may have an interest, issued or to be issued. This absolute and full license to the Naugatuck Company was also an exclusive one, Goodyear covenanting that he would not grant to any other person a right or license to do what he had granted to the Naugatuck Company a license to do. There was reserved, however, in Goodyear, the right, after the 20th of July, 1844, to sell, for a stipulated sum or price in gross, the exclusive right of making, using and vending his said preparations and improvements for any specific purpose, provided that, before such sale, the Naugatuck Company should have the pre-emptive right to become the purchasers, at and for such stipulated price or sum in gross. Before this deed to the Naugatuck Company, namely, on the 24th of May, 1844, which was prior to the issuing of the vulcanizing patent, Goodyear had assigned to D. L. Suydam the two patents for shirred goods—the patent for the manufacture and the patent for the machinery. This assignment was only for the time the patent had to run, and not for any extended term. The right acquired by Suydam, under this assignment, was conveyed back to Goodyear, by deed bearing date the 10th of May, 1845.

There were certain exceptions in the deed of. Goodyear to the Naugatuck Company, which limited the operation of the grant of "the use of any and all his (Goodyear's) preparations of India-rubber and improvements in the preparation of India-rubber, for manufacturing cloths or any other article of merchandise, or any article to which the same may be applicable," to such articles as were not excepted. One of these exceptions was of the right to use said improvements in the manufacture of "napped cloths, coats, capes, mittens and gloves," which were excepted during the whole period of the grant. The right to use such preparation in the manufacture of India-rubber shoes, was excepted for a specific time. After the expiration of such specific time, the right to use said preparation in the manufacture of such shoes was to be in the Naugatuck Company. The right to use the preparation of vulcanized rubber in the manufacture of shirred goods made according to the shirred goods patent of Goodyear, was also excepted so long as Suydam had the exclusive right to manu-

facture such goods. This latter exception is as follows: "And whereas the said Goodyear has heretofore sold to D. L. Suydam, of New York City, the right to manufacture shirred goods, the said right is hereby excepted from the operation of this instrument, in addition to the exceptions above named." By this deed, the Naugatuck Company had no exclusive right to any of the cloths or other articles to be manufactured, whether the cloth was "shirred or corrugated," or not, unless Goodyear's preparation and improvements of India-rubber were used in such manufacture. They had, by the grant, an exclusive right and license to the use of the preparation and improvements of India-rubber in any article to which the same was applied, with certain exceptions.

It is important that it should be understood what rights the Naugatuck Company obtained by virtue of this deed, in order that we may understand what Goodyear and Day meant should be done, when they provided, in the deed, entitled "Memorandum of Agreement," that "a release from the Naugatuck Company, of the right or license to make any articles which, by said before-mentioned agreement, Day is licensed to make, shall be obtained and assigned to said Day, simultaneously with the execution of said articles." This is important, as the plaintiffs claim, that it appears, from the covenant in the "memorandum of agreement" referred to, in reference to a release from the Naugatuck Company, and the manner in which it was executed, that a more extended meaning should be given to the terms "shirred or corrugated goods," than has been given to them when considering the granting clause of the deed first executed by the parties. It should be borne in mind, that, in that deed, Goodyear, in addition to the rights which he granted to Day, in reference to "shirred or corrugated goods," also granted to him the exclusive right, license and privilege, to use his compositions and fabrics, secured to him (Goodyear) by his vulcanizing patent, "in the manufacture of India-rubber hose, of the kind patented by said Day, air-beds and air-pillows of all kinds, Day's patent boat, Griffith's patent cotton-floater, and Day's patent chairs and settees." At that time, the exclusive right to use Goodyear's vulcanized rubber and preparations and improvements patented, in the manufacture of these articles, was in the Naugatuck Company. Consequently, this latter right conveyed to Day would be of little, if of any, avail, unless a release was obtained from the Naugatuck Company. Goodyear, therefore, in that original deed, after having made the grants contained in it, covenanted that he would, at his own cost and expense, repurchase and cancel all assignments and licenses which had been before made by him, touching the rights granted, except the three licenses to Hutchinson & Runyon, to Ford & Co., and to Onderdonk & Letson, so that Day should have the full ben-

efit of the grant. By that covenant, (although the name of the Naugatuck Company is not mentioned,) he, in effect, stipulated that he would obtain from that company a release of the right which they had to use his patented preparations and improvements, in making any of the articles which Day was licensed to make. The covenant, in the "memorandum of agreement," was not more extensive than the covenant in the original deed. It did not require Goodyear to obtain from the Naugatuck Company as much as he was required to obtain by the covenant in the original deed. By the covenant in the original deed, Goodyear obligated himself to obtain from the Naugatuck Company the right which they had to use his vulcanized rubber in the manufacture of "air-beds and air-pillows." By the "articles of agreement," executed November 5th, 1846, the grant, so far as it respects "air-beds and air-pillows," was annulled; and the principal object which the parties had in view, in entering into the stipulation referred to in the "memorandum of agreement," must have been to so limit the duty which Goodyear was under, by his covenant in the first deed, as to free him from the obligation to procure a release from the Naugatuck Company of the right to use vulcanized rubber in the manufacture of "air-beds and air-pillows." There is nothing in either of these covenants to show what was meant by the parties, by the terms "shirred or corrugated goods."

But it is insisted by the plaintiffs, that these covenants should be taken in connection with the release and assignment executed by the Naugatuck Company to Goodyear, of a license to use his preparations and improvements, his vulcanized rubber, in the manufacture of corrugated goods, which license, so released and reassigned, was, at a subsequent period, transferred to Day to be canceled, and was by Goodyear and Day canceled. The release was executed by the Naugatuck Company on the 7th of December, 1846, after all the deeds relating to the grants to Day were finished and completed by delivery. After it was delivered by the Company to Goodyear, it was by him delivered to Day, on the 19th of February, 1847.

The evidence derived from this release to Goodyear, to show what was meant by the term "shirred or corrugated goods," as used in the deed of grant, is extraneous from the deed. It is evidence subsequent to the execution of the deed, to show what the parties then admitted was the import and meaning of the terms "shirred or corrugated goods," at the time they were used in the deed. This evidence is legitimate for this purpose, as well as other acts and admissions of the parties which took place subsequent to the execution of the deed, such as the facts that Day never paid tariff for the manufacture of any corrugated goods, except such as were made according to the patent of March 9th, 1844, that Goodyear always collected tariffs

for woven goods manufactured by other parties, and the numerous other acts and admissions testified to in the many affidavits which have been produced, which go to show that, when the deeds were executed, the parties understood by the terms "shirred or corrugated goods," only such goods as were made according to the shirred goods patent. These extraneous facts are all proper to aid the court in ascertaining what the deeds really mean, when there are difficulties in interpreting their language, in consequence of ambiguities in the terms used. But, when there are no such ambiguities, such evidence is not resorted to. When there are no difficulties in interpreting the language used, the deeds must speak for themselves.

But I feel disposed, in order to see whether there is anything in the release from the Naugatuck Company inconsistent with the construction I have given to the granting clause of the deed, to consider the release separate and distinct from the other acts and admissions of the parties, which took place subsequent to the execution of the deed, and as if it formed a part of the deed. The release from the Naugatuck Company reassigned and transferred to Goodyear all the right, license and privilege which the company had claimed or possessed, under the indenture of July 18th, 1844, or by any other means whatsoever, "to use, in the preparation of any shirred or corrugated goods, or of India-rubber pipe, such as is used by Horace H. Day in his patent hose, Day's patent life-chair and settee, and Griffith's patent cotton floater, and Day's patent boat, any of the improvements by said Goodyear claimed by any patent whatever, or of which he may be the inventor or possessor, and also any right which, by the means aforesaid, or otherwise howsoever, the said Naugatuck India-Rubber Company may have, to manufacture shirred or corrugated goods, or said India-rubber pipe, such as is used by Horace H. Day in his patent hose, Day's patent life-chair and settee, and Griffith's patent cotton-floater, and Day's patent boat." The argument is, that this release, made in pursuance of the requirements of the covenant in the deed contained, purported to transfer to Goodyear a right which the company then had, "to use, in the preparation of any shirred or corrugated goods," any of the improvements of Goodyear claimed by any patents, also any right which they have, either by such means, or otherwise, "to manufacture shirred or corrugated goods;" that the company then had no right either to use, in the preparation of shirred goods made according to the patent of March 9th, 1844, any of the improvements of Goodyear claimed by patent, or to manufacture such goods according to said patent, and that, therefore, the right purported to be reassigned was some other right; and that such other right was the right to use said improvements of Goodyear, claimed by pat-

ent, in the manufacture of elastic rubber goods, or articles not made according to the patent of March 9th, 1844, which right then was in the Naugatuck Company, and that elastic-woven rubber goods were included in and covered by the terms "shirred or corrugated goods."

It is apparent, from the indenture entered into on the 18th of July, 1844, between Goodyear and the Naugatuck Company, that the object of Goodyear was to divest himself of all right which he then had to use any and all of his preparations of "India-rubber, and improvements in the preparation of India-rubber, for manufacturing cloths or any other article of merchandise, or any article to which the same may be applicable, for and during the unexpired term of all patents issued to him, bearing any date whatsoever, and for and during the unexpired term of any other patent or patents, or renewals of patents, owned by him, or in which he may have an interest," and to vest the whole right he then had to such use in the Naugatuck Company. His object was to give up all right to such use, and substitute the Naugatuck Company in his place, they performing certain things as a consideration for such substitution. This being the object of both parties to the indenture, as is manifest from the indenture itself, such a construction should be put upon the instrument as will carry out that object. The exceptions in the indenture in favor of third persons, by which the operation of the general terms of the grant is somewhat limited, were not made for the purpose of reserving in Goodyear any portion of the right granted, and which, without such exception, would seem to be included in the general terms of the grant. The general terms of the grant are, "a full and absolute license to use the thing granted, for manufacturing cloths or any other article of merchandise, or any article to which the same may be applicable." Goodyear gave the company the right to use vulcanized rubber in the manufacture of cloths and any article to which it was applicable; and, as it was applicable to his patented shirred goods, under the description of "cloths," and also under the description of "articles of merchandise," &c., he thereby gave the Naugatuck Company a right to use threads or strands of vulcanized rubber, in the manufacture of his patented shirred goods. But this they could not do so long as Suydam had the rights granted to him, so long as his grant was in force. He had the exclusive right to manufacture "shirred or corrugated goods" according to the patent of March 9th, 1844, for the unexpired term of that patent, with the privilege to use, for said unexpired term, Goodyear's other improvements, in such manufacture.

But this did not include the whole right which Goodyear had to the use of his vulcanized rubber, in the manufacture of goods made according to the shirred goods patent.

A valuable right still remained in him. It is necessary, therefore, to look at the exception, to see if that right was reserved to him, for, if it were not so reserved, it passed to the company by the terms of the grant. That exception was as follows: "And, whereas, the said Goodyear has heretofore sold to D. L. Suydam, of New York City, the right to manufacture shirred goods, the said right is hereby excepted from the operation of the instrument, in addition to the exceptions above-mentioned." Nothing is here reserved in Goodyear. Something is excepted in favor of Suydam. The "said right" is hereby "excepted." What is the "said right" which is so excepted from the operation of the general terms in the granting clause? The "said right" which Goodyear had theretofore sold to D. L. Suydam and nothing more. It is, therefore, in this connection, necessary to see what was sold to Suydam; and, when we have ascertained that, we shall know what was the limitation and exception to the general terms of the granting clause.

We have already seen what was sold to Suydam. His rights under the grant from Goodyear would expire on the 9th of March, 1858. They could continue no longer. The grant to Day was for the unexpired term of any of the patents enumerated, and for all renewals and extensions of the same. It was, therefore, at all events, to continue until the 15th of June, 1858; and, as the vulcanizing patent has been extended, the term of the expiration of the grant is not until the 15th of June, 1865. The grant to the Naugatuck Company was also for and during the unexpired term of all patents issued to Goodyear, bearing any date whatsoever, or owned by him, or in which he might have an interest, whether issued or to be issued, and for any extensions of the same. It is claimed by the plaintiffs, that the grant to the Naugatuck Company was not for any extended term. When we come to the consideration of another point made in the case, it will be shown that this grant carried the extended term.

The defendants claim, that when Suydam, on the 10th of May, 1845, reconveyed to Goodyear the right which he had, Goodyear received the reconveyance in trust for the Naugatuck Company, and that, from that time, the right of the company to use the vulcanized rubber, in the manufacture of "shirred goods" made according to the shirred goods patent, commenced and was vested. But the necessities of the case do not require a determination of the latter question. From what has been made to appear, it is manifest that, at the time the release was executed by the Naugatuck Company, they had a right to the use of the vulcanized rubber, "in the manufacture of such shirred or corrugated goods as should be made according to the shirred goods patent after the 9th of March, 1858," which right it was important to Day to have canceled, in order that he might have the full benefit of his extension grant, and

that the release was obtained from and executed by the Naugatuck Company, with the view, among other things, that they might be divested of this particular right, and that the same might be canceled, so that Day should have the full benefit of his grant.

In the investigation of the question submitted for decision, we have had occasion to examine with much particularity eight several deeds executed by Goodyear, namely, the deeds to the Naugatuck Company, to Hutchinson & Runyon, to Ford & Co., and to Onderdonk & Letson, and the four deeds to Day, the one to the Naugatuck Company having been executed after Goodyear was divested of the right which he granted to Suydam to make "shirred or corrugated goods," and the remaining seven having been executed after he was reinvested with the right which he had so granted to Suydam. When the deed to the Naugatuck Company was executed, he had a right to convey to them the exclusive right and privilege he thereby granted. The terms used in the deed did carry that exclusive privilege; and they were sufficient to carry the whole and exclusive privilege to use such preparations in the manufacture of corrugated goods or cloths made after his shirred goods patent, and would have carried such whole privilege if a prior right had not been outstanding in favor of Suydam. Therefore the exception in the deed. And the question forcibly suggests itself to the mind, why, if Goodyear intended, in the deeds to Hutchinson & Runyon, to Ford & Co., to Onderdonk & Letson, and to Day, to convey a license to use vulcanized rubber in the manufacture of elastic woven rubber goods, he did not use the terms which he used in the deed to the Naugatuck Company, instead of using the terms "shirred or corrugated goods?" The reason is obvious. It is because he had no right to convey a license to use his vulcanized rubber in the manufacture of elastic woven goods, the entire and exclusive right to them being in the Naugatuck Company. But as, at the dates of these seven deeds, he had the right to the "shirred and corrugated goods" granted to Suydam, with the right to use, in the manufacture of such goods, his preparations, the right granted to Suydam having been conveyed back to him, he intended, in these seven deeds, to grant those rights. This was all that he granted, so far as it respects "shirred or corrugated goods." The licenses to Hutchinson & Runyon, Ford & Co., and Onderdonk & Letson, were free licenses, to be enjoyed connectedly or separately. The grant to Day of the 29th of October, 1846, was of an exclusive right, but subject to the rights previously granted to the last-named firms, which last-mentioned rights, by the articles of agreement entered into on the 5th of November, 1856, were by Goodyear to be canceled, as a condition precedent to the right to hold Day to the covenants which he had entered into.

If there were any doubt as to the meaning of the terms in question, as understood by the

parties at the time the agreement of the 29th of October, 1846, was entered into, and as used by them in that agreement, such doubt would be removed by a consideration of the deed of the 5th of December, of the same year. The last-mentioned agreement was executed by both Goodyear and Day, under their hands and seals. It was made after the several free licenses which had, in the year 1845, been executed to Hutchinson & Runyon, to Ford & Co., and to Onderdonk & Letson, were delivered up to be canceled, and the very day they were canceled, at a time when, after the cancellation, there were no outstanding licenses, in favor of any one of them, to manufacture "shirred or corrugated goods" according to the patent of March 9th, 1854, the grant to Suydam having before then been reassigned to Goodyear.

It appears expressly, by the first deed executed on the 5th of November, 1846, and entitled, "Articles of Agreement," that such articles were to be additional or supplemental to the articles entered into on the 29th of October, of the same year, which articles, in the deed of the earlier date, were to be construed and governed by the provisions in the subsequent "articles of agreement" wherein they might differ or be inconsistent, but in all other respects were to remain in full force; and it appears expressly, by the second deed of the said 5th of November, entitled "Memorandum of Agreement," that it was to be auxiliary to the two preceding deeds. And it is to be inferred, that this deed of the 5th of December was executed for the same purposes for which the two deeds of the 5th of November were executed. It was made for some purpose, and, if it were not made to place the subject of the grant beyond all doubt and dispute, it is difficult to conceive of a reason why it was made; for, in it there are no additional grants made, and no additional covenants on the part of Goodyear, and by it Goodyear was not absolved from any of the covenants which he had previously made. Day entered into no new covenant, and was not absolved from any of the obligations of the covenants previously entered into. The agreement of the 5th of December recited, that Goodyear was the owner of the four several patents already mentioned, and possessed the sole and exclusive right to the same, so far as related to the use of all or any of the patented articles, in the preparing and manufacturing of shirred or corrugated goods, except the three said several licenses for the same, which were simultaneously therewith to be assigned to Day to be canceled. It also recited, that Goodyear had agreed to assign to Day the "sole and exclusive right to make, vend and sell to others, shirred or corrugated goods." This is its exact language, and is substantially the same as that used in the granting clause of the deed of the 29th of October, 1846.

The object of this deed of the 5th of December was, to fulfil and carry into full execution the agreements which Goodyear had before made, to assign to Day the "exclusive right to make, vend and sell to others to be used, shirred or corrugated goods." Goodyear, in full execution of the agreement recited, granted and assigned to Day, and Day accepted, the sole and exclusive right, license and privilege, for the whole of the United States, to use the machinery in any of the recited patents described, and to make and vend the shirred or corrugated goods in said patents mentioned, and to use, in the preparation thereof, (namely, in the preparation of the shirred goods mentioned in the patent,) the compounds and fabrics in the letters patent described, for and during the term of the patent, and of any extension thereof; and an exclusive license to use, in the manufacture of the shirred goods specified, all improvements in the composition, fabrics or machinery mentioned, or new composition, fabrics or machinery made or to be made, and for which Goodyear then held, or might thereafter hold, patents. It is clear, that the only exclusive right to make "shirred or corrugated goods," granted and assigned by this deed, was the exclusive right to make such goods as are described in the patent of March 9th, 1844. The language of the grant is, "the shirred or corrugated goods in said patents mentioned." There were no "shirred or corrugated goods" mentioned in any patent except the patent of March 9th, 1844. The parties considered that a grant to make "shirred or corrugated goods" according to the patent of March 9th, 1844, was a complete fulfilment of an agreement to assign the exclusive right to "shirred or corrugated goods." It is very plain that the meaning of the terms "shirred or corrugated goods," as understood and used by the parties to this deed, was the elastic rubber goods manufactured according to the patent of March 9th, 1844, and in that patent denominated "corrugated or shirred India-rubber goods," and that no other kind of elastic goods was meant by the use of those terms.

But, before leaving this part of the case, it should be noticed, that the general conduct of the parties has been in accordance with the views taken by the court of the agreements of 1846, and above set forth. Day, until a comparatively recent period, the fall of the year 1856, never made any claim that this grant of right to "shirred or corrugated goods" included anything more than the right to the shirred or corrugated goods patented by the patent of March 9th, 1844, with the further right to use, in the manufacture of the same, the other patents. It is true that, for a long period, he was in conflict with Goodyear, denying the validity of Goodyear's patent, the validity of which, under his hand and seal, he had acknowledged, and denying, also, the obligation or binding force of the covenants which he had entered into. During that conflict, he was manufacturing the

"shirred and corrugated goods" after the manner of the patent of March 9th, 1844, and was using, in such manufacture, the prepared India-rubber, patented to Goodyear. He was also manufacturing. elastic woven rubber goods not made according to the shirred goods patent, using, in such manufacture, Goodyear's prepared India-rubber. The open conflict between Goodyear and Day terminated in September, 1852. The decision of the court in New Jersey brought it to an end. That decision was, that the patents of Goodyear were valid; that Day was bound by his covenants; and that Day had no right to any use of the Goodyear patents, except what he acquired by virtue of the agreements between him and Goodyear, executed in 1846. Immediately after that decision, Day abandoned the manufacture of elastic woven rubber goods, and sold out his looms for weaving the same. Soon after, he transferred to the Congress Rubber Company all the rights which he had to make "shirred or corrugated goods," which rights subsequently became revested in him. And at no time, from the decision of the court in New Jersey, until the fall of 1856, did he or the Congress Rubber Company, which succeeded to all his rights, make any claim that Goodyear had transferred to him any other right than the right to make the "shirred or corrugated goods" described and mentioned in the patent of March 9th, 1844, though, during that period, other parties were making and selling woven elastic goods containing India-rubber cured or vulcanized according to Goodyear's vulcanizing patent. to compete in the market with the "shirred or corrugated goods" manufactured according to the patent of March 9th, 1844.

The deed of the 24th of May, 1858, executed by Goodyear, purported, for the consideration of one dollar and other valuable considerations, received and to be received by him, as in said deed is provided, to sell and convey to Day, (with an agreement to confirm the same within three months from the 15th of June then next, by such further deed of conveyance as said Day might deem necessary,) the full, absolute and exclusive license. right and privilege to make, use, and vend his (Goodyear's) invention of vulcanized rubber, for the term of the then existing patent, and all extended or renewed terms of said patent, as the same might or could be used in the manufacture of all braided, woven, cemented or sewed fabrics, or such as could be covered, or protected, on one or both sides, with substances other than rubber, and in all smooth, elastic shirred goods; and it was provided that the terms and conditions upon which the license was to be held and enjoyed, as to bonuses, not exceeding in the whole the sum of $30,000, and the tariff, not exceeding five cents a pound on the product, should be fixed and determined by Nathaniel Hayward and Thomas A. Jenckes, whose award in the premises should be final, and should be made within three months from the 15th of June then next.

On this branch of the case, two questions are submitted for consideration: First—Is this deed sufficient to convey the equitable right which it purports to convey, (it being admitted that it did not purport to carry any legal right,) Hayward and Jenckes not being shown to have acted as in the deed is stipulated, provided, at the time it was executed, the equitable right which it purports to convey was vested in Goodyear? Second—Was the equitable right which the deed purported to convey, at the time it was executed, so in Goodyear, that he could, without the concurrence of any one else, in equity convey it? If either of these questions is answered in the negative, then this deed can have no effect in conveying the equitable right purporting to be transferred.

We will first turn our attention to the second question. Goodyear had the right to convey what the deed purported to transfer, unless he had, prior to its execution, parted with that equitable right. It is claimed by the defendants, that, before the execution of this deed, Goodyear did part with such right, to the Naugatuck Company, by the deed to them heretofore mentioned. It is also claimed that he parted with the right by other deeds, which have been produced in evidence. It will be sufficient to dispose of this question, to consider only the deed to the Naugatuck Company. That deed gave the right which it transferred, "for and during the unexpired term of all patents issued to him, bearing any date whatsoever, and for and during the unexpired term or terms of any other patent or patents, or renewals of patents, owned by him, or in which he may have an interest, issued or to be issued." If, by the term "renewed" is meant "extended," and if the term is to be applied to patents "issued to him," then it will follow, especially as Day had full knowledge of the rights granted to the Naugatuck Company, that Goodyear had no right to convey what the deed of the 24th of May, 1858, purported to convey, and that Day, by that deed, acquired no new right which can be protected in a court of equity.

The parties appear to have used the term "renewed" as synonymous with the term "extended." Thus, in the deed of the 24th of May, 1858, the grant is, the use of the invention of vulcanized rubber, for the term of the then present patent, "and all extended or renewed terms of said patent." The then present patent was to expire within twenty-two days. There was an application then pending for an extension, which was afterwards granted. It is evident that the parties did not intend, by the term "renewed," to provide for a reissue of the then present patent, which would expire on the 15th of June, but that they did intend, by the term "renewed," the "extended" patent which had been then applied for. The patent office also

uses the term "renew" as synonymous with the word "extend." Hence, in the extension of the vulcanizing patent, which was made on the 14th day of June, 1858, the language of the commissioner is: "I, Joseph Holt, commissioner of patents, by virtue of the power vested in me by the said acts of congress, do renew and extend the said patent, for the term of seven years from and after the expiration of the first term." The term, "renewal" of patents, was used in the grant to the Naugatuck Company. It was not necessary to carry the right to a reissued patent, for said right would be carried without it. Either this term or some other term or terms synonymous with the word "extended," was necessary to carry the right in an extended patent; and, to carry such latter right, the term "renewal" was introduced into the grant.

The case of Wilson v. Rousseau, 4 How. [45 U. S.] 646, has been referred to, to show that the term "renewal" should not receive the construction which I have given to it. The question in that case arose upon the construction of a covenant executed on the 28th of November, 1829, that, in case of "any improvement in the machinery, or alteration or renewal of either patent, such improvement, alteration or renewal shall accrue to the benefit of the respective parties in interest." At that time, there was no law authorizing an extension of a patent beyond the original term of fourteen years. The first act that authorized an extension was passed in July, 1832 [4 Stat. 559]. Subsequent to the passing of this act and the act of 1836 [5 Stat. 117], the patent was extended, and the question was, whether the extended patent was included in the terms of the covenant. The court, in giving their opinion, use the term "renewal" as synonymous with the term "extension," when they say that, "at the time this covenant was entered into, there was no provision in the patent laws authorizing an extension or renewal of the same beyond the original term of fourteen years. The first act providing for it was passed in July, 1832." The language of that act, in speaking of an "extension," is, "to prolong or renew the term of a patent." And the language of the 18th section of the act of 1836, on the subject of the "extension" of a patent is, "that it shall be the duty of the commissioner to renew and extend the patent." The court, in that case, was "of the opinion that the covenant in question should be construed as having been entered into by the parties with reference to the known and existing rights and privileges secured to patentees under the general system of the government established for that purpose;" that the covenant was entered into "with reference to the established law" as it then was; and that the parties did not intend to provide for any possible change that might be made in the law. The court, therefore, in that case, gave a construction to the term "renewal" with reference to the law as it

then was, there being at that time no law with reference to the renewal or extension of patents.

It is claimed, also, that if, by the term "renewed," was meant an extended patent, it yet did not mean the extension of a patent which had been issued to Goodyear, but only an extended patent which was owned by him, without being issued to him. The language of the grant is, "for and during the unexpired term of all patents issued to him, bearing any date whatsoever, and for and during the unexpired term or terms of any other patent or patents, or renewals of patents, owned by him, or in which he may have an interest, issued or to be issued." The grant was a right to the use of any renewed (or extended) patents, in which he (Goodyear) might have an interest, whether the patent which might be renewed, and in which he might have an interest, was then issued or might thereafter be issued. In this point of view, without taking any other view of the clause in question, the language of the grant is broad enough to include a renewal (or extension) of a patent issued to him; for, "all patents in which he might have an interest," include a patent issued to him.

In the deed to the Naugatuck Company, there is a covenant by Goodyear as follows: "And the said Charles Goodyear does hereby, for himself, his heirs, executors, administrators and assigns, covenant and agree to and with the said Naugatuck India-Rubber Company, not to make, use or vend, or to grant to any other person or company whatever, any other license to make, use or vend, said preparations or improvements in the preparation of India-rubber, or to apply the same to any of the purposes to which the same can be usefully applied, during the continuance of the license hereinbefore specified and granted to the Naugatuck Company." This covenant was subject to certain reservations. This covenant admits that the rights granted by the license to the Naugatuck Company might come to an end before the expiration of the right secured to Goodyear by patent, when Goodyear would be permitted to go on and make grants. And it is argued, that if the license granted to the company was, by the terms of the grant, to continue during the term of any extended patent, Goodyear could not grant a right to use "said preparations" to any other person at any time; and that there would be no time, after the time during which the license to the Naugatuck Company was to continue, when grants to such other persons could be made, unless such a construction is put upon the length of time for which the grant to the company is to be enjoyed, as will limit it to the unexpired terms of the patents then in existence, and will not extend it for the term of a renewed patent. In the indenture entered into between Goodyear and the Naugatuck Company, there are several covenants on the part of the com-

pany, on the non-performance of which the license was to be void and of no effect. It is expressly provided that, if the company shall, for the term of one year, neglect or refuse, or be unable from want of means, to prosecute the business contemplated, or to stamp the articles manufactured, so that the object of the instrument shall fail for said term of one year, then, at the expiration of the year, the license shall become and be void, and of no effect, after said year. When it thus becomes void, and of no effect, Goodyear would have the right to grant licenses to use "said preparations or improvements" named in the covenant, to whomsoever he pleased.

When, therefore, the deed of the 24th of May, 1858, was executed, the license to the Naugatuck Company was in full force. While it remained in full force, Goodyear was precluded from the right to make such a license as the last-mentioned deed to Day purported to make. He had, indeed, the right to sell for a stipulated price, or sum in gross, the exclusive right of making, using and vending said preparations or improvements, or of applying the same to or for any specific purpose or purposes, provided that, before the sale, the Naugatuck Company should have the right to become the purchaser thereof, at and for such price or sum in gross; and such sale to a third person could not be made, except on the neglect or refusal, as aforesaid, of the Naugatuck Company to become the purchaser thereof. Goodyear never attempted to exercise this latter right. At the time the deed of the 24th of May, 1858, was executed, the Union India-Rubber Company had succeeded to all the rights which the Naugatuck Company had acquired from Goodyear; and, on the 28th of September, 1858, the said Union Company, for the consideration of the gross sum of thirty thousand dollars, paid to Goodyear, and of certain tariffs agreed to be paid, received a conveyance from him of a full and exclusive license, right and privilege, to use the invention of vulcanized rubber, originally patented June 15th, 1844, and extended for seven years from the 15th of June, 1858, in the manufacture of "all braided, woven, cemented or sewed fabrics, or such as are or can be covered or protected, on one or both sides, with substances other than rubber, and in all smooth elastic shirred goods, and also to make and sell India-rubber threads of vulcanized rubber, and all threads or sheets of rubber which are or can be made or finished by union with, or are to be covered by, fibrous substances."

Having disposed of this question, the necessities of the case do not require me to determine the other question—whether the deed of the 24th of May, 1858, is sufficient to convey the equitable right which it purports to convey, provided, at the time it was executed, such equitable right was vested in Goodyear. And this opinion has already been so

extended, that I must avoid the discussion of any questions which have been presented, the determination of which is not necessary to a just disposition of the case. From these views, it follows that the motion for an injunction must be denied.

[For other cases involving patent No. 3,461, see note to Warner v. Goodyear, Case No. 17,183. For other cases involving patent No. 3,633. see note to Goodyear v. Central R. Co., Id. 5,563.]