FRANCIS E. CROASDALE, PROSECUTOR, v. THE COURT OF QUARTER SESSIONS OF THE COUNTY OF ATLANTIC.

Submitted December 2, 1915—Decided April 3, 1916.

The Court of Quarter Sessions, as now constituted, is a tribunal having power to punish summarily for contempt committed either in or out of its presence.

On *certiorari.*

Before Justices PARKER, MINTURN and KALISCH.

For the prosecutor, *Lee F. Washington.*

For the defendant, *Clarence L. Cole* and *G. Arthur Bolte.*

The opinion of the court was delivered by

PARKER, J. On August 6th, 1915, the Atlantic County Court of Quarter Sessions made a rule on prosecutor to show cause why he should not be attached for contempt in causing the publication in his newspaper of an editorial article criticising the alleged inaction of the county prosecutor and of the Quarter Sessions in a criminal matter. This rule was based on the usual preliminary affidavit, and on its return, testimony was taken in open court *pro* and *con,* and, subsequently, the rule was made absolute and an attachment awarded and issued. At this stage of the proceedings prosecutor sued out the present writ of *certiorari.* The award of a writ before the termination of the proceedings is supported by the fact that the attack is on the jurisdiction of the court over the subject-matter. See *Palese* v. *Lane,* 95 *Atl. Rep.* 126; *Mowery* v. *Camden,* 49 *N. J. L.* 106, 109.

The question whether there was in fact and law a contempt is not submitted for our consideration in the present proceeding. The point made, and the only point is, that the Court of Quarter Sessions has no power to punish summarily for contempts not committed in its presence.

Counsel argues, and with much force, that under the English law the power to punish contempts not in the face of the court was confined to the superior courts of record and did not extend to the inferior courts; that the Court of Quarter Sessions was an inferior court and had no such power; and that our own Court of Quarter Sessions is founded on its English prototype and has the same limitations on its jurisdiction in matters of contempt. We think, however, that the argument loses its force, in view of the many changes that the Court of Quarter Sessions has undergone since the Revolution, and which changes have amounted to the practical erection of a new court, both in jurisdiction and personnel.

The English Court of Quarter Sessions, in the time of Blackstone, was held before two or more justices of the peace, one of whom must be of the quorum. 4 *Bl.* 271. These justices of the quorum were originally selected for special qualifications, but, by Blackstone's time, practically all were of the quorum. 1 *Id.* 351. The requirement of one justice of the quorum, therefore, lost most, if not all, of its real significance, and in this aspect it is fair to say that as a practical matter the Quarter Sessions could be held before any two or more justices of the peace. Its jurisdiction extended theoretically to all felonies and trespasses whatsoever, but it seldom, if ever, tried any greater offence than small felonies within benefit of clergy; any case of difficulty requiring, by the express terms of the king's commission, the presence of a justice of the King's Bench or Common Pleas, or a judge of assize. 4 *Id.* 271. Such a court was properly denominated an inferior court, and lacked the power to deal summarily with extraneous acts of contempt. *Odg. Lib. & S.* 511; 1 *Gabb. Cr. L.* 287; 2 *Bish. New Cr. L.,* § 263. Our own Courts of Quarter Sessions, in the time of *Paterson's Revision* (1799) and *Elmer's Digest* (1838), may, for the sake of argument, be conceded to have been of this character. They were held by the justices of the peace of the county, or any three of them. *Pat. Rev.* 130, § 2; *Elm. Dig.* 449. Their jurisdiction embraced all crimes, with the following important exceptions: treason, murder, manslaughter, sodomy, rape, polygamy,

arson, burglary, robbery, forgery, perjury and subornation of perjury, and crimes punishable with death; indictments for which, if found in the Sessions, were required to be tried in the Supreme Court, or in the Oyer and Terminer, or general gaol delivery. *Ibid.* It is hardly necessary to remark that the criminal offences remaining within the jurisdiction of the Sessions were of a minor character; and it may well be conceded that such a court, composed of a minimum of three justices of the peace, and restricted in jurisdiction to the minor crimes and misdemeanors, was an "inferior court," and while evidently endowed with jurisdiction to deal summarily with contempts committed in its presence (*State* v. *Keeper, &c.,* 5 *N. J. L. J.* 184), may have lacked that jurisdiction with respect to contempts outside of court, except disobedience of process.

But, with the increase of population and wealth in the early part of the last century, there was a constantly growing tendency to elevate the county courts, both in personnel and jurisdiction. The Common Pleas then consisted of an indefinite number of judges, appointed by the council and assembly under the constitution of 1776, article 12. The justices of the peace seem to have been usually selected as judges (see *Pamph. L.* 1885, *p.* 75), and when the judges all attended court, the bench was often not large enough to hold them. See briefs of counsel in *Schalk* v. *Wrightson,* 58 *N. J. L.* 65, 69; also *Gray* v. *Bastedo,* 46 *Id.* (at *p.* 459). The Orphans Court consisted of these same judges, or any three of them. *Elm. Dig., p.* 360, § 5. The Quarter Sessions, as already observed, consisted of the justices of the peace of the county, or any three or more of them, *ex-officio. Id.* 449, *supra.* Soon the personnel of the Orphans Court and the Sessions was identified with that of the Common Pleas, and the later legislation affected all three courts alike. The first step was to reduce the maximum number of judges of the Common Pleas to five, appointed by senate and assembly in joint meeting, and with a term of five years. *Const.* 1844, *art.* 6, § 6; *Comp. Stat., p.* 43.

Next, in 1846, the Revised Quarter Sessions act (*Rev. Stat. p.* 223) provided that the judges for the time being of the Court of Common Pleas, or any three or more of them, should constitute a Court of General Quarter Sessions of the peace in and for the county. Section 2.

In 1855, by an act to reorganize the courts of law (*Pamph. L., p.* 17), the justices of the Supreme Court were made *ex-officio* judges of the Pleas, Orphans Court and Quarter Sessions (section 4), and have ever since so remained.

At this time, then, the Court of Quarter Sessions in each county consisted of not more than five judges appointed by the joint meeting, who were customarily laymen, and the Supreme Court justice holding the circuit for the county *ex-officio*. Act of 1855, section 5. But his presence was not legally necessary; and the manifest desirability of having at least one trained lawyer always on the bench of this court shortly led to the addition of a "law judge" in the principal counties, and ultimately in all counties. Such a judge was provided in Essex county in 1859 (*Pamph. L., p.* 421); Hudson, 1868 (*Pamph. L., p.* 363); Union, 1868 (*Pamph. L., p.* 580); Middlesex, 1869 (*Pamph. L., p.* 105); Mercer, 1869 (*Pamph. L., p.* 306); Monmouth, 1869 (*Pamph. L., p.* 681); Passaic, 1871 (*Pamph. L., p.* 925). An abstract of these acts will be found as a foot-note to *Rev.* 1877, *pp.* 270, 271. By a constitutional amendment of 1875 the appointment of Common Pleas judges was transferred to the governor, with the advice and consent of the senate. Article 7, section 2, paragraph 1, as amended; *Comp. Stat., p.* 98; the failure to strike out the old clause in paragraph 2 being apparently an oversight.

In 1878, the number of lay judges in counties having a law judge was reduced to two. *Pamph. L., p.* 315. In the same year, a law judge was provided in Morris county (*Pamph. L., p.* 533); similar action was had later as to Hunterdon, 1880 (*Pamph. L., p.* 397); Somerset, 1885 (*Pamph. L., p.* 414); Cumberland, 1889 (*Pamph. L., p.* 492); Atlantic, 1889 (*Pamph. L., p.* 495), and Gloucester, 1891 (*Pamph. L., p.* 547). See *Gen. Stat.* 1895, *p.* 1124, *note.*

In 1894, a general act provided for a law judge in all counties of the second class. *Pamph. L., p.* 173; *Gen. Stat., p.* 1038.

After a futile attempt, in 1895, to abolish the Courts of Common Pleas, Orphans Court, Oyer and Terminer and Quarter Sessions (*Pamph. L., pp.* 323, 647, 807; *Schalk* v. *Wrightson,* 58 *N. J. L.* 50, 78), the legislature abolished all the lay judges in every county, continued the law judges in office, provided for the appointment of a law judge in all counties where there was then no law judge, and that such law judge, or the justice of the Supreme Court, or both, might thereafter hold the Common Pleas, Quarter and Special Sessions and Orphans Court. *Pamph. L.* 1896, *p.* 149. This act was upheld in *Kenny* v. *Hudspeth,* 59 *N. J. L.* 320; *affirmed, Id.* 504. Thus stands the law at the present day as to judges of the Common Pleas (*Pamph. L.* 1900, *p.* 332; *Comp. Stat., p.* 1725, *pl.* 91), who are *ex-officio* judges of the Quarter Sessions. *Pamph. L.* 1898, *p.* 866; *Comp. Stat., p.* 1820; *Pamph. L.* ·1900, *p.* 356, § 33; *Comp. Stat., p.* 1716, *pl.* 52. The acts creating a law judge in the several individual counties generally, if not uniformly, required that he should be admitted to the bar; usually, that he should be a counselor-at-law; and in some cases that he should be a counselor of three years' standing. It is true that there appears to be no such specific requirement in the law of 1900; but the whole trend of the legislation for many years has been toward the elimination of the lay element and the substitution of trained legal skill on the county bench. A glance at the General Statutes of 1895, *pp.* 1033 *et seq.,* especially *pp.* 1035, 1036, will make this phase of the legislative policy sufficiently plain.

It appears, then, that in the course of less than half a century, from a court composed exclusively of justices of the peace, the Court of Quarter Sessions has been developed into a criminal court with no lay element on its bench, in which the justices of the Supreme Court are by law qualified to sit, and in which, on occasion, they actually do sit.

A corresponding development has taken place in the matter of jurisdiction. It will be recalled that from the criminal

jurisdiction laid down in general terms, the graver criminal offences were specifically excepted; but most of the exceptions have been eliminated. In 1874, by legislative revision of that year, the exceptions were reduced to treason, murder and manslaughter. *Rev.* 1877, *p.* 270, § 23. And, in 1898, the exception of manslaughter was also eliminated. *Pamph. L., p.* 866, § 1; *Comp. Stat., p.* 1820. Since that time the Courts of Quarter Sessions have had jurisdiction to try, and at this time do try, almost exclusively, indictments for every kind and degree of crime except treason and murder. It is obvious that by the statutory enlargements of jurisdiction, the standing and importance of the court have enormously increased. In 1884, Chief Justice Beasley, speaking for the Court of Errors and Appeals, characterized the Quarter Sessions as "one of the established courts of this state exercising a general jurisdiction," and added: "The records and judgments of such a tribunal are to be treated in the same manner as the records and judgments of the county Circuit Courts are to be treated." *Schomp* v. *Tompkins,* 46 *N. J. L.* 608, 612.

Taking these two forms of development together—jurisdiction and personnel—it is apparent that the Court of Quarter Sessions as now constituted is a very different tribunal from that of 1799, and while still an "inferior" court in the sense that it does not rank with the Supreme Court or Court of Chancery, it is for working purposes the principal criminal court of the county. The increasing calls of appellate work on the justices of the Supreme Court having compelled their abstention in large measure from engagements at *nisi prius* and assize, the work of the Oyer and Terminer, where the presence of a Supreme Court justice is necessary, is greatly reduced, and the bulk of the criminal trials are held in the Sessions. That court may now be said to rank equally with the Oyer, except in two particulars: It may not try indictments for treason or murder; and the presence of a Supreme Court justice is not necessary, though he may participate.

Now, it is true that in the development traced above, there appears to be no contempt power conferred expressly by statute; but this, in our view, is unimportant. No statute

confers such power on the Court of Errors and Appeals or
the Supreme Court.    There are such statutes relating to the
Court of Chancery.    *Comp. Stat., p.* 435, § 69; *Comp. Stat.,
p.* 442, § 82; *Comp. Stat., p.* 448, § 102.    There is none as
to the Circuit Courts, which are plainly "inferior" in the
sense above specified; nor as to the Oyer and Terminer, which,
though plainly inferior in the same sense, was treated by this
court as a "superior tribunal," so far as outside contempts
were concerned.    *In re Cheeseman,* 49 *N. J. L.* 115, 142.    The
same classification should be accorded to the Quarter Sessions,
composed of the same judges and having (except as to two
crimes only) the same jurisdiction.    The fact that a Supreme
Court justice is not necessarily present does not alter the case;
for, if he be present, the constitution of the court is the same
as that of the Oyer; and it will not do to say that the Ses-
sions would have full summary power over outside contempts
when composed of the two statutory judges, or of the Supreme
Court justice alone, and be without that power when com-
posed of the "law judge" sitting alone.

Such power has, in fact, been exercised in more than one
case removed into this court, and, apparently, without chal-
lenge as to jurisdiction.    In 1893, the Camden Quarter Ses-
sions undertook to punish a newspaper libel summarily, and
on appeal, pursuant to the statute, the conviction was set aside
solely for faulty procedure.    *In re Holt,* 55 *N. J. L.* 384.    The
same court attempted to punish disobedience of a state sub-
pœna, in 1902, and the same course was pursued.    *In re
Haines,* 67 *Id.* 442.    In neither case was there any suggestion
either by counsel or the court that jurisdiction of the subject-
matter was wanting.

Our conclusion is that the Court of Quarter Sessions as now
constituted is a tribunal having power to punish summarily
contempts either in or out of its presence, and the writ of *cer-
tiorari* is therefore dismissed, with costs.